**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>ALL MATTERS RELATED TO NORTH AMERICAN REFRACTORIES COMPANY, *et al.* in Case No. 02-20198, as affected by the May 24, 2013 Order Entering Final Decree entered at Doc. No. 7940,<br><br>*Debtors*. | Misc. Case No. 15-00204 (TPA) |
| NORTH AMERICAN REFRACTORIES COMPANY ASBESTOS PERSONAL INJURY SETTLEMENT TRUST,<br><br>*Plaintiff,*<br><br>v.<br><br>HONEYWELL INTERNATIONAL INC.,<br><br>*Defendant.* | Chapter 11 |

**COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 4

SUMMARY OF RELIEF SOUGHT ..................................................................... 10

JURISDICTION AND VENUE .............................................................................. 16

THE PARTIES ......................................................................................................... 17

BACKGROUND ...................................................................................................... 17

I.      The Structure And Purpose Of The Trust:  To Pay 100% Of Valid Current And Future
        Claims Using Perpetual, Evergreen Funding. ................................................ 17

II.     The Formation Of The Trust:  Honeywell Escapes Tort System Liability. ...................... 20

III.    The Trust's Governing Documents Grant The Trustees The Broadest Possible Powers
        And Discretion To Administer The Trust. ....................................................... 21

IV.     The Trust Agreement Does Not Grant Honeywell The Power Or Discretion To
        Administer Or Interfere With The Trust Or To Make Claim Determinations................. 22

V.      In Exchange For The Extraordinary Protections It Received As A Non-Debtor Under The
        Channeling Injunction, Honeywell Is Obligated To Fund The Trust To Pay 100% Of All
        Valid Claims Plus The Trust's Operating Expenses. ....................................... 24

VI.     The Trustees Carefully Exercise Their Discretion To Process And Pay Valid Claims. .... 25

        A.    The Trustees Set A Strong Foundation For Claims Processing. .......................... 25

        B.    Honeywell Commences Litigation Against the Trust in July 2015. ...................... 26

        C.    The Trust's Progress During The Standstill Period. ........................................... 27

        D.    Since Conclusion Of The Standstill, The Trust Continues To Diligently Process
              And Pay Valid Claims. ......................................................................... 28

        E.    The Conclusion Of The Expanded Audit Of Claimant Firm A, The Trust's
              Notices To Honeywell, Honeywell's Silence, And Honeywell's Belated
              Objection. ........................................................................................ 33

VII.    Honeywell Secretly Orchestrates A Buy-Out Of Its Evergreen Funding Obligations To
        The Trust. .......................................................................................... 36

VIII.   Honeywell Initiates Renewed Litigation To Intimidate And Attempt To Extort The Trust
        Based On Mischaracterizations And Inaccuracies. ........................................ 40

IX.     Honeywell's Repeated And Consistent Abuse Of Its Rights And Benefits Under The
        Trust Documents And The Plan...................................................................................... 43

        A.     Honeywell's Attempts To Abuse The Consultation Process, Obstruct The Claims
               Process, And Deny The Trust Access To Relevant Information. ......................... 43

        B.     Honeywell Enjoys The Benefits Of The Plan While Attempting To Circumvent It.
               ............................................................................................................................. 45

        C.     Honeywell's Actual Funding To The Trust For The Payment Of Claims Is Far
               Less Than Projected. ............................................................................................. 50

        D.     Honeywell's Claim That The Trustees Are Mismanaging Trust Assets and
               Engaging In Wasteful Spending Is Made In Bad Faith. ....................................... 53

COUNT 1 – Honeywell's Breach of the Trust Agreement and the TDP – Obstruction of the
        Trustees' Administration of the Trust...................................................................... 55

COUNT 2 – Honeywell's Breach of the Covenant of Good Faith and Fair Dealing .................. 57

COUNT 3 – Honeywell's Violations of 11 U.S.C. § 524(g)....................................................... 58

PRAYER FOR RELIEF ............................................................................................................. 59

The North American Refractories Company ("**NARCO**") Asbestos Personal Injury Settlement Trust (the "**Trust**"), by and through its undersigned counsel, respectfully files this Complaint against Honeywell International Inc. ("**Honeywell**") seeking an order: (i) finding and declaring that Honeywell has breached and is continuing to breach its obligations, and has attempted to exercise contractual rights granted exclusively to the Trustees, under the Trust's governing documents, (ii) finding and declaring that Honeywell has violated and is continuing to violate Section 524(g) of the Bankruptcy Code, (iii) enjoining Honeywell from continuing such breaches and violations, and (iv) awarding relief against Honeywell in an amount and in a manner deemed appropriate by this Court.  The Trust alleges as follows:

## PRELIMINARY STATEMENT

1.      For years, Honeywell has pursued a campaign of intimidation and threats against the Trustees with the goal of coercing them to reject valid claims, ignore the terms of the TDP,[1] abandon their fiduciary duties to the Trust, and save Honeywell's shareholders many millions of dollars at the expense of NARCO asbestos victims.  That campaign has included a series of baseless objections to broad categories of valid claims and repeated threats to seek to remove the Trustees unless they yield to Honeywell's demands.  Since emerging from mediation in 2017, Honeywell has backed down every single time that the Trustees held ground and continued to pay all valid claims.  Until now.

2.      Honeywell has sent the Trust a complaint that it intends to file as early as today. That complaint is unsupported by facts and meritless under the law.  The context and timing of Honeywell's threatened filing, along with the series of events that Honeywell has engineered leading up to it, underscore Honeywell's bad faith and improper motives in launching this latest

---

[1]      Capitalized terms and abbreviations are defined below.

attack on the Trust and its Trustees.  As detailed below, Honeywell is filing its complaint to retaliate against the Trustees for refusing to accept a "take-it-or-leave it" proposal by Honeywell to:  a) eliminate Honeywell's evergreen obligation to fund all payments to valid claimants and to cover all expenses incurred in administering the Trust in perpetuity, which provision was the centerpiece of the quid-pro-quo that Honeywell agreed to in order to secure the extraordinary benefits of the Channeling Injunction; b) accept a lump sum payment set by Honeywell that would provide Honeywell with a significant discount on its total claims liability as a substitute for that evergreen funding obligation; c) modify the terms of the Trust Documents to, among other things, increase the evidentiary standards that claimants must meet to secure compensation for the injuries they suffered; and d) release Honeywell and its agents from any and all future liability.

3.      After the Trust and Honeywell stipulated to a dismissal of Honeywell's prior litigation against the Trust in early 2016, the parties engaged in an eighteen-month mediation before the Hon. Judith K. Fitzgerald (Ret.).  During that period, the Trust adopted an Individual Review Claim Form, a Claims Audit Program, and ADR Procedures.  The Trustees also developed an IR Model with the help of a statistical expert and continued to refine the Trust's written directives concerning proof of exposure to NARCO asbestos-containing products.  Following the parties' litigation standstill period, in full consultation with all Trust constituents, the Trust further refined its exposure directives concerning affidavits with "formulaic" language to account for the Trust's actual experience processing claims, further knowledge about tort system outcomes, and the Trust's concerns that the then-existing exposure directives could render valid claims deficient.

4.      Honeywell has repeatedly attempted to obstruct the Trust's progress.  Between 2018 and 2019, Honeywell twice threatened to sue the Trust for various purported violations of the Trust Agreement and TDP.  In fact, Honeywell even threatened to sue the Trustees in their

personal capacities and seek to remove them from their positions. Despite Honeywell's pressure tactics and attempted intimidation, the Trustees continued to process and pay valid claims. In mid-2019, Honeywell began making contributions to the Trust's annual contribution claims fund because the Trust's initial liquid assets finally ran out. As a result, Honeywell had to develop a new approach to slow claims processing and impede the Trust's progress to avoid dipping into its corporate treasury.

5.      In September 2020, the Trust was provided a "term sheet" for a proposed Buy-Out Agreement prepared by Honeywell's lawyers that would fundamentally alter the terms of the NARCO Plan of Reorganization, Trust Agreement, and TDP. The Trust received a draft "Buy-Out Agreement" and hundreds of pages of additional buy-out related documents over the next two months. In those documents, Honeywell proposes, among other things, to alter existing, Court-approved claims processing standards and eliminate its Court-mandated obligation to fund in perpetuity 100% of payments due to valid claimants and fund all of the Trust's administrative expenses. While Honeywell's own expert estimated during NARCO's bankruptcy that Honeywell's total claims liability could be approximately $2.3 billion, plus the costs of administrating the Trust, Honeywell proposes releasing itself from its financial obligations to the Trust for a lump sum cash payment of $506 million (as of today), which will continue to be reduced by any additional claims payments made by the Trust before the effective date of the proposed Buy-Out Agreement.[2] In addition, by the terms of the proposed Buy-Out Agreement, Honeywell

---

[2]      The draft Buy-Out Agreement proposed paying the Trust "a one time, lump sum payment in the amount of $640 million . . . reduced as follows: (i) by $20,171,283, reflecting the $19,748,383 and $422,900 Honeywell paid the NARCO Asbestos Trust on or about August 4, 2020 in respect of ACC and PEC claims (as those terms are defined in the TDP); (ii) by an additional $24,700,550, reflecting the $23,851,550 and $849,000 Honeywell paid the NARCO Asbestos Trust on or about November 6, 2020 in respect of ACC and PEC claims, and (ii) by any

proposes granting itself a share of the proceeds realized from a future sale of the Trust's ownership interest in HarbisonWalker International—the Trust's most significant asset other than its contractual right to Honeywell's perpetual funding.  Honeywell also demands a complete release from all liability to the Trust, the Constituents, and any and all claimants.

6.      In addition, Honeywell's proposed Buy-Out Agreement proposes forever altering the Trust's Court-approved claims processing policies and procedures.  Among other things, the proposed Buy-Out Agreement (i) caps the value of Individual Review claims that do not specifically identify a NARCO asbestos-containing product to no greater than the Scheduled Value or Average Value for that claim (as defined by the TDP), (ii) provides Honeywell with the right to approve any amendment to the Trust's list of approved worksites at which NARCO asbestos-containing products are presumed to be present, and (iii) alters the general standards for exposure evidence under Section 4.7(b) of the TDP.  At the same time, the complaint that Honeywell intends to file today makes allegations against the Trust that assume those new claims processing policies and procedures *are already in place* by reading words into the TDP that do not exist.

7.      In effect, under the proposed Buy-Out Agreement, Honeywell would continue to receive all of the benefits from the Section 524(g) channeling injunction, extinguish all of its ongoing obligations under the Plan, the Trust Agreement, and the TDP, forever alter the Trust's standards for processing and paying valid claims, and potentially realize a cash rebate from a future sale of the Trust's assets.

---

other ACC or PEC indemnity payments that Honeywell makes to the Trust from November 7, 2020 through the Buy-Out Effective Date, regardless of when the payment obligation accrued (the amount owed by Honeywell as reduced by the preceding sentence hereinafter referred to as the 'Net Honeywell Buy-Out Payment')."  (Buy-Out Agreement § 1(a)-(b).)  As of September 20, 2021, the "Net Honeywell Buy-Out Payment" would be $506,119,519.

8.      Honeywell understands that its proposed revisions to the Trust's governing documents and operations require the consent of the Trust and the other Constituents, and final approval by the Bankruptcy and District Courts.    To that end, Honeywell's proposed Buy-Out Agreement requires that the Trust file an "expert valuation[] in support of the Buy-Out and its adequacy, including without limitation, in support of the NARCO Asbestos Trust's ability to continue to pay all current and future claims at 100% of their TDP values following the Buy-Out Effective Date."  The proposed agreement also requires the Trust to "represent[] and warrant[]" that it has "conducted its own investigation and review of the transactions contemplated" and "come to its own determination, with the assistance of [its] advisors, consultants, and experts, that the transactions . . . are fair and reasonable in all respects and adequate to pay 100% of all valid current and future NARCO Asbestos Trust Claims," all without "relying on Honeywell or any of Honeywell's agents." To make these representations and warranties, the Trust would have to conduct extensive due diligence.  As will become clear, Honeywell never intended to afford the Trust that opportunity, and instead resorted to bullying and extortionate tactics, hoping to pressure the Trustees to disregard their fiduciary duties and rubber stamp a home-cooked deal for Honeywell shareholders.

9.      On December 23, 2020, Honeywell's Chief Litigation Counsel informed the Trust by letter that Honeywell would commence a lawsuit against the Trust and Trustees on or after January 25, 2021.   Honeywell simultaneously demanded that the Trust produce one of its consultants for a full-day, deposition-style "audit" interview concerning virtually all of the issues identified in the complaint that it intends to file with the Court.  Honeywell also demanded that the Trust cooperate with an immediate audit of the Trust's finances.  The Trust agreed to both of Honeywell's demands.  On February 12, 2021, the chair of McDermott Will & Emery LLP's

litigation practice group, accompanied by Honeywell's Chief Litigation Counsel, "interviewed" the Trust's consultant for a full day. The Trust also offered to make its personnel and records available for a financial audit, but Honeywell abandoned that request.

10.     Despite the Trust's full cooperation with Honeywell's audit rights, Honeywell was unable to manufacture legitimate claims against the Trust. Honeywell instead continued pressuring the Trust to rubber-stamp its proposed buy-out of its evergreen funding obligations for the amount that Honeywell proposed, on the terms that Honeywell proposed, on the timeline that Honeywell proposed, and with the budget that Honeywell approved. The Trust and the Trustees, along with their professionals and experts, diligently evaluated Honeywell's proposed buy-out on those terms, including by performing a preliminary claims projection and valuation of the Trust's equity interest in HWI. Throughout those nine months, the Trust's professionals met with Honeywell to discuss those diligence efforts and to solicit additional information that the Trust's experts needed to perform their analyses. On several occasions, Honeywell's counsel reminded Trust representatives of its outstanding threat to file suit if the Trustees could not find a way to support Honeywell's discounted buy-out of its evergreen funding obligation.

11.     While the Trust was conducting a preliminary evaluation of Honeywell's buy-out proposal, Honeywell's appointed directors to HWI, a company that is 79% owned by the Trust but whose directors are appointed by Honeywell, caused HWI to distribute a $47.4 million dividend to the Trust. Under the Trust's governing documents, that $47.4 million dividend automatically supplanted Honeywell's obligation to contribute to the Trust's annual contribution claims fund until the dividend is depleted.

12.     Honeywell suggested for the first time on August 10, 2021, that its buy-out proposal was potentially negotiable and suggested that the Trust first provide a description of its preliminary

claims analysis, and then consider developing a counteroffer.  The Trust took Honeywell up on

that suggestion.  On September 3, 2021, the Trust provided a detailed letter describing its claim

projection expert's preliminary projections and offered to provide a counterproposal to

Honeywell's buy-out by November 19, 2021.  It has now become clear, however, that Honeywell's

requests were a bad-faith ruse.

13.    Instead of responding to the Trust's letter, Honeywell informed the Trust that it

would commence litigation.  Unlike in 2018, 2019, and 2020, when Honeywell thrice threatened

to sue the Trust (and once threatened to sue its Trustees personally), but then did not, Honeywell

now apparently intends to carry out its threat, seeking to escape its obligations and extinguish its

Court-mandated duty to fund the Trust and compensate NARCO asbestos victims fully.  Moreover,

in its lawsuit, Honeywell virtually ignores this recent history, choosing instead to advance stale

and baseless claims challenging long-established policies and practices used by the Trustees in

administering the Trust, all of which were disclosed to Honeywell and are fully consistent with the

terms of the TDP.  Honeywell's attempts to extort and intimidate the Trust must end.

## SUMMARY OF RELIEF SOUGHT

14.    The Trust seeks declaratory and injunctive relief against Honeywell, the non-debtor

beneficiary of an extraordinary channeling injunction (the "**Channeling Injunction**") that was

approved pursuant to the NARCO Bankruptcy Plan (the "**Plan**").  The Channeling Injunction

shields non-debtor Honeywell from the tort system liability that bankrupted its affiliate NARCO,

and for which Honeywell was financially responsible.  The Channeling Injunction protects

Honeywell by limiting the remedies available to existing and future claimants who have suffered

the crippling and frequently fatal effects of exposure to NARCO asbestos-containing products,

prohibits NARCO-related litigation against Honeywell in the tort system, and channels all asbestos claims into the Trust, which assumes any and all liability for such claims.

15.    To secure the protections of the Channeling Injunction, Honeywell agreed—and was ordered by this Court—*to perpetually fund the Trust in amounts up to one hundred and fifty-million dollars per year* to cover Honeywell's approximately $2.3 billion in total liability that Honeywell's own expert projected during NARCO's bankruptcy proceedings.  All claims must be resolved and, if valid, paid in accordance with the terms of the Trust Agreement and the TDP. While Honeywell provided the initial funding to the Trust, it avoided making any such annual payments between the effective date of the Trust in 2013 and the second half of 2019.

16.    Honeywell has engaged in a multi-faceted, multi-year scheme designed to reduce its obligations under the Trust Agreement and the TDP, to undermine the good-faith efforts of the Trustees to fulfill the Trust Agreement's mandate that the Trust promptly pay valid claims, and to evade the requirements imposed on it by Section 524(g) of the Bankruptcy Code and the Channeling Injunction.  Moreover, Honeywell has attempted to induce claimants to withdraw their claims filed with the Trust or refrain from filing claims at all by entering into secretly negotiated side-deal settlements outside the established Trust structure and in direct violation of the Channeling Injunction and Section 524(g).  In fact, Honeywell appears to be seeking to compensate on the side, through deals that it is negotiating outside of the Trust's structure and without the Trust's input, the very same law firms that it targeted with its 2015 complaint, the two draft complaints that it has served on the Trust since then, and the complaint that it intends to file today.

17.    Honeywell has implemented its scheme by using the following tactics, among others:

i.    Time and again, Honeywell has threatened to commence litigation against the Trust
(including litigation seeking to remove the Trustees) unless the Trustees used their
discretion to deny numerous categories of claims that meet the standards of the TDP,
adopt strained and unreasonable interpretations of the TDP that would eliminate tens
of millions of dollars of valid claims, and approve the terms of a non-negotiable buy-
out proposal made by Honeywell that would eliminate its Court-mandated obligation
to fund the Trust in perpetuity.

ii.   Honeywell has repeatedly misused its right to be consulted on certain matters
concerning the development of the Trust's procedures by, among other things, making
piecemeal and redundant objections during the developmental phase of those
procedures, making staggered and delay-inducing demands of the Trust, taking
inconsistent positions over time as to the compensability of claims, and  refusing to
provide to the Trust information only available to Honeywell that would allow the
Trustees to evaluate Honeywell's various objections.

iii.  Honeywell has disingenuously criticized and challenged claims filed with the Trust by
cherry picking claimants who specifically identified NARCO asbestos-containing
products in their exposure affidavits submitted to the NARCO Trust, after they did not
explicitly and specifically identify NARCO by name during prior litigation against
other defendants.  In fact, however, when NARCO was litigating pre-bankruptcy
asbestos claims in the tort system, NARCO directed its defense counsel not to ask
questions about NARCO asbestos-containing products unless the deponent mentioned
NARCO first.  On information and belief, that directive was made in bad faith to
support a subsequent argument, now advanced by Honeywell, that such claimants were

never exposed to a NARCO asbestos-containing product and submitted conflicting and fraudulent sworn statements in that regard.

iv.     Honeywell is now challenging certain claimants who do not specifically name a NARCO product, even though the Trust requires and evaluates evidence submitted by such claimants that supports the conclusion they were exposed to a NARCO asbestos-containing product on an "Approved Worksite" (i.e., a worksite at which Honeywell has stipulated to the presence of NARCO asbestos-containing products during particular date ranges),[3] in compliance with this Court's prior ruling, which explicitly permits the Trust to consider "the totality of evidence that is presented in support of the claim and drawing inferences therefrom." Honeywell is pursuing this challenge against the Trust despite the fact that Honeywell itself recognized the validity of such claims in October 2015, during its last legal attack on the Trust.

v.     Honeywell has secretly negotiated (and, in at least one instance, completed) side deals with claimants' law firms outside the Trust's structure and procedures, and without the Trust's knowledge or participation. Any attempts by Honeywell to circumvent the Trust violate the terms of Section 524(g), the Channeling Injunction, and the requirement that all NARCO claims "will be resolved pursuant to the terms, provisions and procedures set forth in" and "will be paid in accordance with" the Trust Agreement and the TDP.

18.     Honeywell has also made relentless threats against the Trust and its Trustees for the apparent purpose of pressuring the Trustees into Honeywell's bidding and usurping the Trustees' rights and obligations under the Trust's governing documents. The complaint that

---

[3]     *See* TDP § 4.7(b)(1), n. 10 & Attachment C.

Honeywell intends to file against the Trust today provides a perfect example. The complaint that Honeywell has shared with the Trust accuses the Trust of adopting a blanket policy to pay claims that allege exposure solely to "refractory products" and of violating an order of this Court. Both accusations are false and, on information and belief, made for the purpose of pressuring and smearing the Trustees. As reflected in the *Stipulation and Order* entered by this Court on March 17, 2016 [Doc. No. 376], the Trust agreed that it would not implement such a policy and would instead draw inferences with respect to individual claims only on a case-by-case basis considering the totality of the circumstances. The Trust has abided by that agreement and order. That Honeywell nevertheless accuses the Trust of violating both the TDP and this Court's order is not only disingenuous, it is bad faith.

19.    Honeywell has similarly attempted to usurp the Trustees' rights under the Trust Agreement and TDP by attempting to dictate claims processing policies and procedures concerning so-called "form" affidavits while paying such claims on the side. The Trust's current procedures concerning "form" affidavits were developed in accordance with the terms of the Trust Documents and are the result of a proper exercise of the discretion that is exclusively granted to the Trustees. Those procedures were implemented following an eighteen-month period of intense mediation and consultation under the guidance of former Bankruptcy Court Judge Judith K. Fitzgerald (Ret.), were developed through extensive consultation among the Trust, Honeywell, the TAC, and the FCR (defined below, and collectively the "**Constituents**"), and have been tested, in part, by detailed audits undertaken by an independent firm approved by Honeywell and retained by the Trust. Honeywell's attempts to dictate claims processing policies and procedures concerning such claims are entirely improper.

20.    Honeywell has similarly challenged the claim valuation models (the "**IR Model**") and procedures developed, tested, adopted, and implemented by the Trust to process Individual Review claims.   The IR Model was developed in accordance with the terms of the Trust Documents, and their implementation was a proper exercise of the discretion that is exclusively granted to the Trustees.   The IR Model and procedures were adopted after extensive consultation among the Constituents, involved the input of various independent experts retained by the Trust, and were developed during the mediation before Judge Fitzgerald (Ret.).   Honeywell does not have consent rights over the Trust's decisions concerning Individual Review, and Honeywell's consultation rights have been fully satisfied.   Nevertheless, Honeywell continues to act as if it has rights that remain entirely with the Trustees.

21.    Finally, Honeywell has attempted to dictate the Trustees' decisions concerning the Trust's staffing and engagement of consultants.   Specifically, Honeywell has made baseless allegations that the Trust's continuous retention of consultants employed by a firm affiliated with one of the Trustees since mid-2016 is improper, and has argued that the Trust must hire full-time employees instead.   But Honeywell is again acting contrary to the explicit terms of the Trust's governing documents.   Section 5.8 of the Trust Agreement states that the Trustees may employ and consult with experts "regardless of whether any such [expert] is affiliated with any of the Trustees in any manner."   (Trust Agreement § 5.8.)   This provision alone confirms that the engagement is permissible and that Honeywell's attempts to control the Trustees' day-to-day administration of the Trust are improper.   Moreover, the decision to retain the consulting firm that Honeywell now complains of was made by the two unaffiliated Trustees (the affiliated Trustee having recused himself) in exercise of their discretion.   That engagement has given the Trust access to highly experienced and capable people who would otherwise be unavailable to the Trust.   The

affiliated Trustee always recuses himself from votes concerning the consulting firm's engagement and fees, including votes approving payment of its regular invoices. Honeywell's objection to that retention is a belated and wrongful attempt to cast a cloud over the Trust and seize rights and obligations that belong solely to the Trustees.

22.    Honeywell's conduct, described in this pleading and to be presented at trial, breaches the express terms of the Trust Documents and the covenant of good faith and fair dealing implied in those Documents, and violates the provisions of Section 524(g) of the Bankruptcy Code and the Channeling Injunction.

23.    The Trust and its Trustees are duty-bound to preserve the Trust's compliance with Section 524(g). In fulfilling that duty, the Trust asks this Court to enter an order (i) finding that Honeywell has violated the provisions of Section 524(g) and the terms of the Trust Documents, (ii) enjoining Honeywell from any further violations, and (iii) providing such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction to hear the matters in the above-captioned adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

25.    Additionally, in its *Order Entering Final Decree Closing Certain Chapter 11 Cases*, No. 02-20198-TPA [Doc. No. 7940] (Bankr. W.D. Pa. May 24, 2013), this Court retained jurisdiction to "enforce the terms and conditions of the Plan[] (including all related documents contemplated by the Plan[])," which include the TDP and the Trust Agreement.

26.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

27.    Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

28.     This adversary proceeding has been brought in accordance with Bankruptcy Rules 7001(7) and 7001(9).

## THE PARTIES

29.     Plaintiff North American Refractories Company Asbestos Personal Injury Settlement Trust is a Delaware statutory trust.  The Trust was created to assume the asbestos-related liabilities of NARCO, non-debtor Honeywell, and certain affiliates.  The Trust is administered by three Trustees:  Mark M. Gleason, The Honorable Ken M. Kawaichi (Retired), and Richard B. Schiro, Esq.  The Trustees were approved by the Bankruptcy Court.

30.     Defendant Honeywell International Inc. is a Delaware corporation with its principal place of business located at 300 South Tryon Street, Charlotte, NC 28202.

## BACKGROUND

### I.     The Structure And Purpose Of The Trust:  To Pay 100% Of Valid Current And Future Claims Using Perpetual, Evergreen Funding.

31.     The Trust is a settlement trust created pursuant to the December 28, 2005 Third Amended Plan of Reorganization of the North American Refractories Company (as amended, the "**Plan**"), confirmed by this Court's order dated November 13, 2007.

32.     As set forth in the Trust Agreement, the "purpose of the NARCO Asbestos Trust is to assume . . . any and all liabilities of Honeywell" and certain affiliates "with respect to any and all NARCO Asbestos Trust Claims" and "to use the NARCO Asbestos Trust Assets and income to promptly pay holders of valid NARCO Asbestos Trust Claims in such a way that holders of similar NARCO Asbestos Trust Claims are paid in substantially the same manner; and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B)(i) of the Bankruptcy Code."  (Trust Agreement § 2.2.)

33.     Prior to April 30, 2013, the Trust's effective date, Honeywell and NARCO had together paid approximately $1.75 billion to settle personal injury and wrongful death asbestos claims, and still faced a massive number of filed or threatened claims.  Honeywell was liable for claims arising from exposure to NARCO's asbestos-containing products.  The Channeling Injunction approved in NARCO's bankruptcy plan protected non-debtor Honeywell from the liability that bankrupted NARCO and for which Honeywell was liable.

34.     As part of the Plan, Honeywell agreed to fund the Trust in perpetuity, subject to certain annual dollar maximum payments as provided in the Trust Agreement.  In exchange, Honeywell, without filing for bankruptcy, received the protection of a Section 524(g) channeling injunction directing all existing and future NARCO asbestos-related claims to the Trust for resolution.  The Confirmation Order[4] describes the essence of the bargain that Honeywell struck in exchange for securing the Channeling Injunction and enjoining all litigation against Honeywell:

> A trust expense fund will also be established and funded by contributions from Honeywell . . . .  Honeywell will contribute to the Annual Contribution Fund on a quarterly basis an amount of cash equal to the amount of NARCO Asbestos Trust Claims approved and queued for payment (subject to annual caps) during the preceding quarter.

(Confirmation Order, Ex. 1 ¶¶ 150-57.)

35.     The 524(g) Channeling Injunction limits the remedies available to current and future asbestos claimants.  In exchange for a Honeywell-funded settlement trust from which they may obtain relief, claimants surrender their right to have their personal injury claims adjudicated by a federal or state court.  (Plan §§ 5.4.1 & 9.1.10.)

---

[4]     "**Confirmation Order**" refers to the Revised Findings of Fact and Conclusions of Law attached as Exhibit 1 to Revised Memorandum Opinion on Confirmation of Debtors' Third Amended Plans of Reorganization [Case Nos. 02-20198 & 02-21626, D.I. 5507].

36.     Without the benefit of the Channeling Injunction, Honeywell—a solvent defendant that never sought protection under Chapter 11 despite being liable for NARCO's asbestos claims and that recently had a market capitalization of approximately $150 billion—would have been forced to litigate countless lawsuits in the tort system, with all the attendant risk of adverse jury verdicts in any number of jurisdictions, and without NARCO as a co-defendant to share that liability.   In exchange for the protection that the Channeling Injunction provides, Honeywell agreed to cede control of the type of litigation and settlement decisions that a defendant typically makes in the tort system.  (Plan § 9.1.18.)  Rather than exercise that control with no fixed cap on its potential NARCO-related asbestos liabilities, Honeywell opted to limit its financial exposure and abide by the procedures that govern the Trust.  (Plan § 9.1.6.)

37.     The Court approved Honeywell's release and the Channeling Injunction based on its findings that Honeywell's financial commitment to the Trust was sufficient to pay 100% of the current and future asbestos claims that may be asserted against Honeywell and the Debtors' estates pursuant to the TDP, plus the Trust's operating expenses.  (*See* Confirmation Order, Ex. 1 ¶¶ 163-66.)   The Court based its findings on the "uncontroverted testimony" of Honeywell's own valuation expert (*see* May 19, 2003 Declaration of Francine Rabinovitz, PhD (Doc. No. 4356), ¶ 29), which it credited and repeatedly cited.  (Confirmation Order, Ex. 1 ¶¶ 73, 74, 150, 163-68, 323-25, 328.)

38.     This Trust is unique as the only asbestos-related bankruptcy trust funded every year on an "evergreen" basis by a solvent defendant and, therefore, the only trust in a position to pay 100% of every valid claim.  Honeywell's commitment of evergreen funding sufficient to pay every claim submitted to the Trust was an essential element in its bargain to receive the benefit of the Channeling Injunction.  In exchange for that funding commitment, Honeywell was permitted to

spread its estimated $2.3 billion liability over many years and to cap its annual liability at $150

million (or less, as permitted under the Trust Agreement) per year.  The Court approved the Trust

Agreement and a draft of the TDP.  Honeywell agreed to both documents.

## II.    The Formation Of The Trust:  Honeywell Escapes Tort System Liability.

39.    On the Effective Date, the Trust assumed NARCO's and Honeywell's liabilities

with respect to present and future NARCO asbestos-related claims and embarked on its mandate.

40.    The Trust Agreement emphasizes that the Trustees are to pursue the settlement of

claims over all other dispute resolution mechanisms, and should do so fairly and efficiently:

> In their administration of the [TDP], the Trustees shall favor
> settlement over arbitration, arbitration over resort to the tort system,
> and fair resolution and compensation of claims in all cases, in a
> manner as inexpensive and efficient as reasonably possible, in
> accordance with the [TDP].

(Trust Agreement § 3.5.)

41.    The TDP sets forth procedures for processing and paying asbestos-related claims

"with the intention of paying all claimants over time based on historical values for substantially

similar claims in the tort system."  (TDP § 2.1.)

42.    Since the Effective Date, the Trust has been administered by three highly qualified

and experienced Trustees:  Mark M. Gleason, The Honorable Ken M. Kawaichi (Ret.), and Richard

B. Schiro, Esq.  Each Trustee was chosen based on his qualifications and experience, was agreed

to by Honeywell, and was approved by the Court.  (Confirmation Order, Ex. 1 ¶ 159; Trust

Agreement pp. 1, 37, & 38.)  Mark M. Gleason has over 35 years of experience in accounting,

finance, business planning, financial reorganizations, litigation support, fraud investigations, and

business valuations.  Mr. Gleason has served as trustee for four other asbestos settlement trusts in

addition to the Trust, with some such roles beginning as early as 1998.  Judge Kawaichi served for

nearly three decades as a municipal and superior court judge in Alameda County, California. He also served as the Alameda County asbestos coordinating judge and conducted Case Management Conferences, Law and Motion Calendars, and Jury Trials in a number of asbestos cases until his retirement in 2003. He currently serves as a trustee for four 524(g) asbestos-injury settlement trusts in addition to the Trust. Richard B. Schiro's over 50-year legal career includes serving as a trustee or future claimants' representative in several other 524(g) settlement trusts.

### III.   The Trust's Governing Documents Grant The Trustees The Broadest Possible Powers And Discretion To Administer The Trust.

43.   The Trust Agreement was entered into on April 30, 2013, by Honeywell, the Trustees, Wilmington Trust (the "**Delaware Trustee**"), the NARCO Trust Advisory Committee (the "**TAC**"), and the NARCO Asbestos Future Claimants Representative (the "**FCR**").

44.   The Trustees are fiduciaries to and are responsible for administering the Trust, including reviewing, processing, and paying claims pursuant to the TDP.[5] The Trustees' activities are governed by the Trust Agreement, the NARCO Asbestos Personal Injury Settlement Trust Bylaws (the "**Bylaws**"), and the TDP.

45.   The Trust Agreement endows the Trustees with the broadest possible powers and discretion under Delaware law to administer the Trust and fulfill its purpose:

> the Trustees shall have the power to take ***any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the NARCO Asbestos Trust***, including, without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto, and ***any trust power now or hereafter permitted under the laws of the State of Delaware*** . . . .

---

[5]   The Trust Agreement also established the TAC and the FCR and empowers them to carry out specified duties. The TAC "serve[s] in a fiduciary capacity representing all holders of present NARCO Asbestos Trust Claims," and the FCR serves as a fiduciary for future claimants. (Trust Agreement §§ 6.1 and 7.1.) In aid of their duties to Trust beneficiaries, the Trust Agreement grants the TAC and the FCR certain rights related to administration of the Trust and implementation of the TDP. (*Id.* § 3.2(d).)

(Trust Agreement § 3.1(a) (emphasis added).)

46.     Necessarily included in that broad grant of "any trust power" is the power to exercise discretion in administering the Trust, interpreting and construing the TDP's terms and provisions, and determining whether claims satisfy the TDP's criteria.

47.     In exercising that authority, the Trustees may "consult with . . . parties deemed by the Trustees to be qualified as experts on the matters submitted to them."  (Trust Agreement § 5.8.) If the Trustees do consult such experts, "the written opinion" of those experts "on any matters submitted to them by the Trustees shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of any such party."  (Trust Agreement § 5.8.)

48.     The Trust Agreement further provides that "the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred" by the Trust Agreement.[6]  (Trust Agreement § 3.1(b).)

49.     The Plan, pursuant to which the Trust was created, also states that the Trust's "*determinations with regard to individual claims . . . shall not be subject to the Court's review*." (Plan § 11.2.16 (emphasis added).)

### IV.     The Trust Agreement Does Not Grant Honeywell The Power Or Discretion To Administer Or Interfere With The Trust Or To Make Claim Determinations.

50.     The Trust Agreement grants Honeywell certain limited bargained-for rights with respect to the Trust.  For example, the Trust Agreement provides that the Trustees shall "consult"

---

[6]     Where the Constituents have express rights to object or consent, the Trust Agreement makes clear that, in the event of disputes, presumptions shall be made in favor of the Trust.  (*See* Trust Agreement § 8.1(b) ("the burden of proof with respect to the validity of the objection of Honeywell . . . shall be on [Honeywell]"); *see also id.* § 8.14 ("the burden of proof shall be on the Party or Parties who withheld consent to show that the objection was valid")).)

with Honeywell (as well as the TAC and the FCR) on certain matters, including on the "*general*

administration*" of the Trust and the "*general* implementation and administration" of the TDP.

(Trust Agreement § 3.2(d).)

51.     The Trust Agreement and the TDP also provide that the Trustees shall obtain the

consent of the Constituents (including Honeywell) in certain specific and limited circumstances.

(*See, e.g.*, Trust Agreement § 3.2; TDP § 3.2.)

52.     Trust Agreement § 3.2(d)(i)-(vi) itemizes six actions that require the Constituents'

consent, and provides that the Constituents "shall not unreasonably withhold" such consent.  One

of those six actions is amending the TDP.[7]

53.     Under the TDP, Honeywell has designated audit rights.  Section 4.8(b) of the TDP

provides that "Honeywell shall, at its sole discretion and expense, be entitled to review all aspects

of the NARCO Asbestos Trust, including but not limited to its operations, claims processing

procedures, and results."  As part of its audit rights, Honeywell may "make recommendations to

the NARCO Asbestos Trust, the NARCO Asbestos TAC and the NARCO Asbestos Future

Claimants Representative concerning the NARCO Asbestos Trust, including but not limited to the

NARCO Asbestos Trust's claims processing operations."  (TDP § 4.8(b).)  Section 4.8(b) also

states that "[a]ny disputes . . . arising pursuant to recommendations Honeywell makes shall be

subject to the dispute resolution procedures set forth in Section 8.14 of the NARCO Asbestos Trust

Agreement."

54.     Honeywell receives extensive information from the Trust that it uses to audit the

Trust.  The Trust regularly provides Honeywell with various Trust records, including minutes and

---

[7]     When the Trust adopts a policy that Honeywell does not like but has no power to control,
Honeywell often argues that the policy constitutes a "*de facto* amendment" of the TDP.

materials from the Trustees' weekly meetings, claims audit reports, advance notice of claims processor directives, and other documents.  To permit Honeywell to monitor claims processing activities in real time, the Trust provides Honeywell with monthly data extracts from the database of filed claims, weekly claims activity reports from the Trust's claims processor, and real-time access to the Trust's claims processing system.

55.     This "one-way mirror" into the Trust's eClaims data (the "**One-Way Mirror**") gives Honeywell unfettered live access to the same claims processing system used by both the Trust and its claims processor and enables Honeywell to see as much as the Trustees about the status of every claim.  The One-Way Mirror enables Honeywell to view in real time all claims filings, the processing status of every claim, and the claims on which the Trust has extended offers. Honeywell and its attorneys use the One-Way Mirror extensively to review, analyze, question, and criticize the Trust's claims processing.  For example, Honeywell reviews exposure affidavits submitted by specific claimants, generates reports concerning claims approved for offers, and obtains up-to-the-minute statistics concerning the claims filed by each law firm.  Honeywell's counsel has even set up its own team of shadow claims processors—a team of reviewers dedicated to tracking the Trust's processing of claims.

**V.      In Exchange For The Extraordinary Protections It Received As A Non-Debtor Under The Channeling Injunction, Honeywell Is Obligated To Fund The Trust To Pay 100% Of All Valid Claims Plus The Trust's Operating Expenses.**

56.     Trust Agreement § 2.3 creates three Honeywell funding obligations: (1) the Trust Expense Fund, (2) the Annual Contribution Claims Fund (the "**ACC Fund**"), and (3) the Pre-Established Claims Fund.  Honeywell's obligation to fund the ACC Fund is subject to annual caps

that have generally ranged from $140 million to $150 million, depending on the year.  (Trust Agreement § 2.3(c)(i)(A)(I).)[8]

57.      Honeywell has repeatedly asserted that it can "***unreasonably*** withhold" its consent in certain circumstances despite the apparent prohibition by the Trust Agreement.  Specifically, citing Trust Agreement § 3.2(d), Honeywell claims that it may "unreasonably withhold" its consent to ***any*** Trust decision that increases the Trust's expenses.  But Trust Agreement § 3.2(d) refers only to actions that both are consent items identified in Trust Agreement § 3.2(d)(i)-(vi) ***and*** "would increase the amount of funding required from Honeywell under Section 2.3," which in the case of the ACC Fund is limited to actions that would raise the annual caps on Honeywell's funding obligation.

58.      Nowhere in the Trust Documents is Honeywell granted any rights to administer the Trust or to determine whether a claim satisfies the criteria in the TDP.  Indeed, the Trust Agreement does not obligate the Trustees to even consult Honeywell with respect to the determination of whether a claim should be approved for payment.

## VI.    The Trustees Carefully Exercise Their Discretion To Process And Pay Valid Claims.

### A.  *The Trustees Set A Strong Foundation For Claims Processing.*

59.      Since the Trust's Effective Date, the Trustees frequently have been in the challenging position of reconciling conflicting input from the Constituents.  The Trustees strive for consensus when possible, but ultimately the Trustees' duty is to make decisions after appropriate input (where applicable) and to pay valid claims.  Accordingly, the Trust Documents leave nearly all decisions to the Trustees' discretion, and ***require*** the Trustees to process claims in

---

[8]      The Trust Agreement § 3.2(d) provides that "no such action which would increase the amount of funding required from Honeywell under Section 2.3 above may be taken without Honeywell's consent, which it may withhold in its sole and absolute discretion."

accordance with the TDP—even when one or more Constituents disagree.  The obligation to process in accordance with the TDP is particularly important when a Constituent (here, Honeywell) claims that the TDP means something that it does not say.

60.    When disagreements among the Constituents arise, the Trustees listen to all sides and view these disagreements as opportunities to engage in robust dialogue.  These discussions inform the Trust's adoption of guidelines and policies governing claims processing.  For example, in February 2016, the Trustees adopted a set of directives concerning the evaluation of exposure evidence submitted by claimants (the "**Exposure Directives**").  The Exposure Directives clarified, among other things, the meaning of the terms "competent evidence" and "credible evidence," which are used (but not defined) in Section 4.7(b)(3) of the TDP.

**B.** *Honeywell Commences Litigation Against the Trust in July 2015.*

61.    Despite the Trustees' efforts to balance the Constituents' interests and process and pay valid claims consistent with the Trust's governing documents, Honeywell previously commenced (and has since repeatedly threatened to commence) litigation against the Trust and the Trustees.

62.    On July 13, 2015, after engaging in a non-binding confidential mediation with the Trust, Honeywell filed a 72-page complaint against the Trust, sought expedited discovery, and moved for a preliminary injunction based on an allegation that the Trust had "secretly" implemented a blanket policy of approving claims that identified exposure solely to the types of products NARCO manufactured, i.e. refractory products, rather than specific "NARCO asbestos-containing products."  *See Memorandum of Law in Support of Honeywell International Inc.'s Motion for a Preliminary Injunction Against the NARCO Trust* at 11, *In re N. Am. Refractories Co.*, No. 15-00204 (TPA) (Bankr. E.D. Pa. July 13, 2015).  Honeywell's theory was not borne out at the three-day hearing that ensued, where the evidence showed that the Trust had *not* "secretly"

implemented a "refractory inference" and was *not* deceiving Honeywell.  *See* Order at 9, n.7, *In re N. Am. Refractories Co.*, No. 15-00204 (TPA) (Bankr. E.D. Pa. July 13, 2015).

63.     Nevertheless, the Trust agreed during Honeywell's 2015 litigation that it would not "as a matter of blanket policy, accept a bare assertion that the claimant worked around refractory products as sufficient to meet the exposure standard under the [TDP]," but would instead ***"evaluate claim submissions on a case-by-case basis, considering the totality of evidence that is presented in support of the claim and drawing inferences therefrom."***  *Stipulation and Order* ¶ 5, *In re N. Am. Refractories Co.*, No. 15-00204 (TPA) (Bankr. E.D. Pa. Mar. 17, 2016).

### C. *The Trust's Progress During The Standstill Period.*

64.     In April 2016, the Trust and its Constituents, including Honeywell, entered into an eighteen-month litigation standstill and mediation (the "**Standstill**") with Judge Fitzgerald as the mediator.

65.     During the Standstill, the Trust made decisions and implemented policies based on full input from all Constituents and Judge Fitzgerald (Ret.).  After extensive discussions and negotiations with the Constituents, the Trust adopted an Individual Review Claim Form, a Claims Audit Program, and ADR Procedures.  The Trust also developed the IR Model for valuing Individual Review claims with input from a statistical expert, further refined the Exposure Directives, and engaged experienced consultants to assist with Trust operations, policies, and claims processing.

66.     The Trustees also continued to engage in an active dialogue with the Constituents whenever possible.

67.     For example, the Trustees held monthly meetings with Honeywell—until Honeywell unilaterally canceled those meetings.  Counsel to Honeywell explained that Honeywell preferred not to continue those monthly meetings out of concern that off-the-record sessions "could

alert [Honeywell] to something that we want to ask or re-ask separately as part of our audit" and thereby build a record to use against the Trust in litigation.  (Email from J. Calandra to R. Strickland, Oct. 6, 2016.)

68.     Even after Honeywell cancelled the monthly meetings with the Trustees, the Trust's consultants continued to participate in weekly meetings with counsel to Honeywell, again until Honeywell determined the meetings were unnecessary.  Honeywell's counsel explained that Honeywell does "not have any questions for discussion" or "need weekly calls" and, as such, would "be taking the weekly meetings off the calendar."  (Email from Y. Bekker to N. Snyder & S. Hymes, Dec. 12, 2017.)

69.     In addition to access to the One-Way Mirror, the Trust provides Honeywell with weekly claims activity reports from the Trust's claims processor and comprehensive data extracts from the database of filed claims every month.  In addition, the Trustees supervise their consultants and attorneys to ensure that Honeywell receives all information responsive to its audit requests in a timely manner.

70.     Using all of that access and information, Honeywell can pose questions to and raise issues with the Trust.  When Honeywell does so, the Trust responds.

**D.  *Since Conclusion Of The Standstill, The Trust Continues To Diligently Process And Pay Valid Claims.***

71.     Since the Standstill's conclusion in November 2017, the Trust has continued to refine its policies and operations in consultation with the Constituents and has ensured that it pays valid Trust claims promptly and efficiently.  In December 2017, following extensive mediation of the issue, the Trustees proposed revisions to the Exposure Directives to reflect (i) the Trust's experience processing claims, (ii) the Trustees' concerns that the existing Exposure Directives could render compensable claims deficient, and (iii) the Trust's discovery of information

concerning tort system outcomes, which further informed its interpretation of the TDP designed to reflect those outcomes.

72.    The Trustees consulted with the Constituents concerning these proposed revisions to the Exposure Directives and made modifications in response to their comments.  The Trustees made these revisions to the Exposure Directives in compliance with their obligations under the TDP and consistent with feedback they received through mediation and from the Constituents.

73.    The Trust also requested information from Honeywell that would assist in revising the Exposure Directives.  That request was in keeping with Honeywell's obligation to provide certain information to the Trust pursuant to a cooperation agreement with the Trust signed on April 30, 2013 (the "**Cooperation Agreement**").  However, Honeywell refused to provide much of what the Trust requested, including exposure evidence underlying hundreds of thousands of NARCO claims settled by Honeywell between 2002 and 2007, before receiving the benefit of the Section 524(g) Channeling Injunction.  (Letter from J. Calandra to S. Esserman, Jan. 22, 2018.)

74.    The Trustees also made a good-faith effort to consult with Honeywell on the worksheets that the Trust's claims processors use to review and evaluate claims pursuant to the revised Exposure Directives.  On January 24, 2018, Honeywell asked when it would receive the revised worksheets.  The Trust responded the same day that the "worksheet modifications are still in process" and "Honeywell will get a copy of them as usual when ready."  (Email from R. Strickland to J. Calandra, Jan. 24, 2018.)  Honeywell responded *two minutes later preemptively objecting* to the revised worksheets, stating "Honeywell object [*sic*] to them as well." (Email from J. Calandra to R. Strickland, Jan. 24, 2018.)

75.    In February 2018, based on feedback received from all Constituents, the Trust adopted further revisions to the Exposure Directives (the "**February 2018 Directives**") to address

the processing of "form" language in certain exposure affidavits.  The February 2018 Directives were further revised in December 2018 after another round of consultation with all Constituents. The directives in force today provide a reasoned, methodical approach to the review of "form" language that gives weight to other aspects of a claim submission that may enhance credibility (such as whether the claimant was exposed on a stipulated worksite, or whether the affiant was an eyewitness to the exposure).  Pursuant to the current directives, a claim can be adequately supported by formulaic exposure allegations where:

    i.    exposure occurred on a worksite during the time period Honeywell has stipulated a NARCO asbestos-containing product was present;

    ii.    exposure occurred on a worksite after the time period Honeywell has stipulated a NARCO asbestos-containing product was present and the affiant was an eyewitness of the exposure, or

    iii.    exposure occurred on any other worksite, and the affiant was an eyewitness of the exposure, and the injured party had an occupation Honeywell has stipulated was regularly exposed to asbestos.

76.    The Trust has also instructed its claims processor concerning claims supported by "form" language that do not satisfy any of the three criteria described above.  The claims processor is instructed to issue a deficiency if there is no additional evidence beyond the form language. Alternatively, the claims processor is instructed to refer the claim to Trust counsel if the claim is supported both by formulaic exposure allegations and additional evidence that on its own does not satisfy the TDP's exposure criteria.

77.    Honeywell's imminent complaint disingenuously claims that the Trust has broken promises to Honeywell and this Court in connection with its "form" affidavit directive.  The Trust

has broken no such promises by implementing the current processing directives. Iterative changes to the processing directives are common in this Trust as the Trustees strive to refine procedures to make sure TDP requirements are being correctly and fairly applied. All revisions to the Trust's claims processing systems are made in an effort to carry out the Trust's mandate and are based on feedback from the Trust's Constituents, the claims processor, independent experts and auditors, and claimants' counsel.

78.     The Trust has continued to build upon other processes developed during the Standstill. For example, the Trust implemented a Claims Audit Program and hired Mazars USA LLP ("**Mazars**") as its claims auditor. Mazars was selected from a pool of twenty candidates from whom the Trust requested proposals. Honeywell participated in the claims auditor selection process and agreed with the Trust's decision to retain Mazars.

79.     Mazars has selected 1,781 claims for random audits in connection with the Claims Audit Program, or an average of 7.7% of claims in the Trust's Payment Queue. The claims selected for pre-offer random audits were filed by 101 different law firms. As of September 9, 2021, approximately 1,489 random audits have concluded and approximately 18 are near conclusion. Of the 119 unique law firms whose claims have entered into the payment queue since the inception of the Claims Audit Program, Mazars has audited claims filed by 85% of those firms.

80.     The Trust has also conducted expanded audits of specific law firms. The Trust defers the payment of the vast majority of claims filed by law firms subject to such an audit until Mazars completes its work. For example, the Trust did not process claims from one of the firms ("**Claimant Firm A**") that Honeywell has complained of previously and now targets in its own complaint, until after the conclusion of Mazars' lengthy expanded audit. Claimant Firm A has been the subject of many of Honeywell's letters to the Trust and, on information and belief, has

drawn Honeywell's attention due to the number of clients that it represents and its refusal to accept a side-deal settlement with Honeywell. However, between this expanded audit and the ongoing random audit of claims filed by all firms (including Claimant Firm A), Mazars has audited 545 claims filed by that firm.

81.   The Trust has also continued to engage with Honeywell and the other Constituents concerning claims processing matters. For example, the Trust worked with the Constituents for months to craft an affirmation of compliance with claim filing requirements, now set forth in Part 4 of the Individual Review Claim Form. The Trust has continued to value claims using the IR Model and shares the ongoing results of those valuations with Honeywell. In addition, as the Trust's Claims Audit Program has progressed and evolved, the Trust has addressed concerns identified through those audits with the respective claimant law firms and has shared the results of completed audits with Honeywell.

82.   The Trust is now functioning as intended by paying 100% of valid Trust claims—and only valid Trust claims—promptly and efficiently. In fact, since the Standstill's conclusion, the Trust has paid 21,737 Trust claims, including 17,310 Expedited Review and 4,427 Individual Review claims. The rate at which the Trust processes, identifies, and pays valid Trust claims has also increased significantly since the parties were last before the Court. In 2020, for example, the Trust processed 12,826 unique claims through exposure review, 8,746 unique claims through medical review, and 930 unique claims through IR valuation review. In addition, the Trust paid 4,254 total claims valued at $79.8 million. From the beginning of 2021 through August 31, the Trust has processed 8,277 unique claims through exposure review, 5,363 unique claims through medical review, and 354 unique claims through IR valuation review. The Trust has also paid 5,284

total claims valued at $96.5 million in 2021 through August 31, 2021.  The Trust is current with processing claims.

### E.   *The Conclusion Of The Expanded Audit Of Claimant Firm A, The Trust's Notices To Honeywell, Honeywell's Silence, And Honeywell's Belated Objection.*

83.     The Trust's progress caused Honeywell to ramp up its coercive tactics against the Trust and the Trustees.

84.     On May 29, 2018, Honeywell sent the Trust a 53-page draft complaint (the "**May 2018 Complaint**") and stated that it intended to file that complaint—which alleged claims against both the Trust and the Trustees personally—the next day.  At the center of Honeywell's May 2018 Complaint was the Trust's February 2018 Directives and its implementation of a "form" affidavit policy after consulting with the Constituents.  Simply put, having failed to convince the Trustees to impose a blanket policy rejecting demonstrably valid claims supported by competent and credible "form" affidavits, Honeywell resorted to threatening litigation to intimidate the Trustees into adopting Honeywell's position.

85.     Honeywell also challenged a variety of additional claims processing policies and procedures, including the Trust's adoption of an IR Claim Form and development of an IR Model.  Finally, demonstrating its true motivation to strong-arm the Trustees, Honeywell's May 2018 Complaint sought to remove the Trustees on the purported basis that the Trustees had mismanaged the Trust's assets and abided a certain conflict of interest (which in fact is not a conflict and is expressly permitted under the Trust Agreement).  Honeywell's complaint included numerous false and misleading statements that would not have passed muster.  That is because, on information and belief, Honeywell never intended to file that complaint, but instead sent it in an attempt to improperly coerce the Trustees into complying with Honeywell's demands.

86.     Despite Honeywell's improper threats, the Trustees continued to manage the Trust diligently, pay valid claims, and otherwise fulfill their fiduciary duties.  Honeywell did not file the May 2018 Complaint and, when the Trust submitted its proposed 2019 operating budget a few months later, Honeywell insisted that budget be a "non-litigation" budget.

87.     Nonetheless, on February 5, 2019, barely five weeks into 2019, Honeywell sent the Trust a revised 59-page complaint (the "**February 2019 Complaint**") and revealed for the first time that it had engaged Kirkland & Ellis LLP, a second major law firm, in addition to McDermott Will & Emery LLP, to litigate its purported claims against the Trust.  Once again, Honeywell alleged that the Trust's "form" affidavit policy, IR Claim Form, and IR Model violate the Trust Agreement and TDP, and that the Trust was wasting assets and abiding a conflict of interest.  Moreover, Honeywell made Claimant Firm A the centerpiece of the February 2019 Complaint despite the Trust's then-ongoing expanded audit of claims filed by that law firm.  Honeywell informed the Trust that it would file the February 2019 Complaint "tomorrow" and that it was merely providing a copy to the Trust as a "courtesy."

88.     Despite Honeywell's renewed threat to commence litigation against the Trust, the Trustees continued to carry out their fiduciary duties to the Trust, including by paying valid claims, adhering to policies that comply with the Trust Agreement and TDP, and properly administering the Trust in all other respects.  Honeywell never filed the February 2019 Complaint.

89.     On April 29, 2019, the Trust informed Honeywell by letter that Mazars had completed its expanded audit of Claimant Firm A.  The letter attached Mazars' expanded audit report (the "**Expanded Audit Report**") as well as reports on the 186 random audits that Mazars had completed for individual claims filed by Claimant Firm A.  (*See* Letter from S. Esserman to J. Calandra, April 29, 2019.)  The Trust informed Honeywell that, based on Mazars' reports and the

Trust's own analysis, the Trustees had decided to extend offers on 3,109 claims filed by Claimant Firm A.  (*Id*.)

90.     The following day, the Trust's counsel called Honeywell's counsel to confirm that Honeywell had received the letter.  Honeywell's counsel confirmed that Honeywell had received the Trust's letter and did not then raise any objection to it.

91.     Three days later, on May 3, 2019, having received no response from Honeywell, the Trust sent Honeywell a list of claims filed by Claimant Firm A for which it planned to extend offers.  (Email from N. Snyder to Y. Bekker, May 3, 2019.)  This email also met silence.

92.     After three more days passed, on May 6, 2019, the Trust extended offers on the 3,109 claims filed by Claimant Firm A.

93.     Nearly a month passed, still with no objection from Honeywell.

94.     On May 30, 2019, the Trust informed Honeywell that it planned to issue offers on additional claims the following day, including 1,347 claims filed by Claimant Firm A.  (*See* Email from N. Snyder to Y. Bekker, May 30, 2019.)  Again, Honeywell did not object.  The following day, the Trust made those offers.  Honeywell did not object then either.

95.     Not until June 12, 2019—more than a month after the Trust first informed Honeywell of its intent to resume ordinary-course processing of claims filed by Claimant Firm A—did Honeywell even address the Trust's April 29, 2019 letter.  (*See* Letter from T. Holcomb to Trustees, June 12, 2019.)  In a letter dated June 12, 2019, Honeywell criticized Mazars' expanded audit of Claimant Firm A and questioned the Trust's decision to extend offers on the 4,456 claims.  (*Id*.)  Honeywell purported to "reserve[] all rights" and threatened to bring the offers "to the Court's attention should the current buy-out negotiations fil [*sic*] to produce a settlement." (*Id*.)

96. Honeywell's threats remained hollow. Between June 2019 and December 2020, the Trust paid 10,886 claims valued at $135.1 million, consistent with its purpose of promptly and efficiently paying all valid Trust claims.

## VII. Honeywell Secretly Orchestrates A Buy-Out Of Its Evergreen Funding Obligations To The Trust.

97. Because Honeywell's attempts to intimidate the Trustees through litigation threats are ineffective, Honeywell has simultaneously pursued another route. Between 2018 and 2020, Honeywell secretly negotiated, without the Trust's involvement, a buy-out of its evergreen funding obligations to the Trust. Honeywell excluded the Trust from those discussions, over the Trust's repeated requests to be included, despite that Honeywell's evergreen payment obligations are contractual rights that belong solely to the Trust and only the Trustees have the power under the Trust Agreement to sell or compromise the Trust's property.

98. The Trust first became aware that Honeywell was discussing a potential buy-out with the TAC after Honeywell threatened to file its May 2018 Complaint. On October 19, 2018, after several months had passed without Honeywell inviting the Trustees to participate in those discussions (or even soliciting the Trustees' views), the Trust asked Honeywell, the TAC, and the FCR to provide periodic written reports concerning those discussions. (Email from S. Esserman to J. Calandra, Oct. 19, 2018; Email from S. Esserman to A. McMillan & E. Harron, et al., Oct. 19, 2018.) The Constituents did not provide any such written reports. Instead, Honeywell's counsel stated that Honeywell would likely provide an update concerning those buy-out discussions by December 2018. (Email from J. Calandra to S. Esserman, Nov. 1, 2018.)

99. Honeywell never provided that update. Instead, Honeywell quietly retained Kirkland & Ellis as its *second* outside litigation counsel and, when buy-out discussions stalled by early February 2019, threatened to re-commence litigation against the Trust. Instead of following

through on that threat, Honeywell apparently pushed its buy-out plan forward in earnest, threatening to sue the Trust only if that plan failed.

100.    On September 30, 2020, the Trust received for the first time a draft "NARCO Buy-Out Term Sheet" that was marked "FINAL" and was dated five days earlier (the "**Buy-Out Term Sheet**").  The Buy-Out Term Sheet contemplated, among other things, that (i) Honeywell would be released from its evergreen funding obligations in exchange for a lump sum payment to the Trust, (ii) the Trust would sell its largest asset other than Honeywell's evergreen funding obligation, i.e., its 79% equity stake in HarbisonWalker International ("**HWI**"), (iii) the TDP would be amended to incorporate Honeywell's preferred evidentiary standards for IR claims, (iv) the Trust Agreement would be amended to reduce the maximum annual payments to claimants, and (v) the Trustees would resign and be replaced.  Honeywell did not afford the Trust any opportunity to comment on, review, or propose revisions to the Buy-Out Term Sheet before it was finalized.  The Trust nevertheless provided suggestions on the Buy-Out Term Sheet to the TAC and FCR, from whom the Trust had received it.

101.    On October 26, 2020, the Trust received voluminous documentation that purported to memorialize the proposed buy-out in a definitive "Buy-Out Agreement," amend the Trust's governing documents, and add various ancillary documents to be executed in connection with the buy-out terms.  None of that documentation accounted for the Trust's suggestions to the Buy-Out Term Sheet.  But that documentation did impose significant obligations on the Trustees, including obligations to (i) conduct their "own investigation and review of the transactions contemplated" by the Buy-Out Agreement, including the sufficiency of Honeywell's proposed lump sum payment HWI's current and future value, (ii) reach their "own determination, with the assistance of [their] advisors, consultants and experts," that the proposed buy-out would be "fair and reasonable in all

respects and adequate to pay 100% of all valid current and future NARCO Asbestos Trust Claims," and (iii) determine "that the NARCO Trust will have at least $835.7 million . . . available as a result of the Buy-Out and that this amount . . . will be sufficient to pay valid current and future claims at 100% of their TDP values, based in part on the assumption that HWI can be sold at some future date following the Buy-Out Effective Date at an enterprise value of at least $250 million." (Buy-Out Agr. § 5.)

102.    The Trust requested a call with Honeywell to discuss the process by which the Trust would comment on the terms of the proposed buy-out.  During that November 3, 2020 call, however, Honeywell's outside counsel informed the Trust's outside counsel that Honeywell would not negotiate with the Trustees, would not review or comment on the Trust's draft documents or markups, and would not "renegotiate" the Buy-Out Term Sheet.  According to Honeywell's outside counsel, the proposed buy-out was a done deal, "period, end of story."  (Letter from S. Esserman and R. Strickland to P. Sacripanti and J. Calandra, Nov. 3, 2020.)

103.    The Trust refused to accept Honeywell's latest intimidation tactic.  Shortly after Honeywell's outside counsel refused to discuss the proposed buy-out with the Trust, the Trustees reiterated their intent to carefully analyze the proposed buy-out, including by consulting with appropriate professionals, and reminded Honeywell that it would be required to fund the Trust's budget for that endeavor.  The Trust also engaged two experts to evaluate Honeywell's proposal: Alvarez & Marsal ("**A&M**"), to evaluate the Trust's total potential liability for NARCO asbestos claims, and Perella Weinberg Partners ("**PWP**"), to perform a preliminary valuation of the Trust's 79% equity in HWI.  But when the Trust submitted the budget that it would need to comprehensively evaluate Honeywell's proposal, Honeywell refused to fund it, arguing that the

Trust should do less work at a lower cost and rely on the TAC's and FCR's professionals (rather than hiring independent professionals).

104.    Instead of permitting the Trust and the Trustees to conduct their due diligence on the complex transaction that Honeywell orchestrated to unburden itself of a multi-billion-dollar liability, Honeywell returned to its same old playbook.  On December 23, 2020, Honeywell informed the Trust that it intended to recommence litigation against it and the Trustees.

105.    Once again, Honeywell did not file its complaint.  Instead, in February 2021, Honeywell's General Counsel and Chief Litigation Counsel asked the Trust to propose a revised budget that would enable A&M and PWP to perform a preliminary evaluation of the economic aspects of the proposed buy-out.  While the Trust objected to Honeywell's piecemeal approach to evaluating the buy-out proposal, it agreed to perform the preliminary economic analysis that Honeywell requested, on the terms that Honeywell requested, with the budget that Honeywell requested.  The Trust received Honeywell's limited buy-out evaluation funding on February 26, 2021, and immediately went to work.

106.    In May 2021, at the conclusion of the Trust's nine-week evaluation period, the Trust provided Honeywell with a presentation and update concerning A&M and PWP's preliminary economic analyses.  The Trust also identified additional categories of information that would assist the Trust's experts in evaluating Honeywell's proposal.  A&M continued to refine its preliminary claims projections following that preliminary update.

107.    On August 10, 2021, Honeywell's counsel requested a written summary of the Trust's preliminary economic evaluation of the buy-out proposal within one month.  The Trust agreed to Honeywell's proposed timeline.  In addition, for the first time, Honeywell's counsel invited the Trust to submit a comprehensive buy-out counterproposal.

108.    The Trust provided a comprehensive, written explanation of A&M's preliminary claims projection on September 3, 2021.  (Letter from S. Esserman to J. Calandra, Sept. 3, 2021.) Unsurprisingly, the Trust's preliminary claims projection indicated that Honeywell had low-balled the Trust with its initial buy-out proposal.  Nevertheless, the Trust also accepted Honeywell's proposal to develop a counteroffer and stated that it would provide such a counteroffer by November 19, 2021.  Honeywell did not respond to the Trust's letter, but instead informed the Trust that it would immediately file a complaint on unrelated grounds.

**VIII.    Honeywell Initiates Renewed Litigation To Intimidate And Attempt To Extort The Trust Based On Mischaracterizations And Inaccuracies.**

109.    The complaint that Honeywell intends to file today is not based on legitimate, timely disputes about claims processing and the Trust's administration, but on an out-of-date, inaccurate record manufactured for the sole purpose of initiating litigation against the Trust.

110.    In addition to renewing many of the allegations that Honeywell levied against the Trust and Trustees in the May 2018 and February 2019 Complaints—but abstained from timely pursuing—Honeywell now claims that the Trust has resurrected the so-called "refractory inference" that it alleged in its July 2015 complaint and violated an order of this Court. Honeywell's latest allegations are belied by five years' of transparent disclosures by the Trust to Honeywell.

111.    Specifically, Honeywell has claimed that it first learned in a July 2020 email exchange between its outside counsel and one of the Trust's consultants that the Trust had re-implemented a blanket policy of paying claims supported solely by allegations that claimants were exposed to "refractory products," rather than NARCO asbestos-containing products.  First, there is no "blanket policy" or any "refractory inference."  And Honeywell has been well aware *since February 2016* that the Trust would pay at least some Trust claimants (i.e., certain claimants at

"Approved Worksites") whose claims files set forth particular facts supporting a case-specific inference that the claimant was exposed to NARCO asbestos-containing products even if they did not specifically identify a NARCO asbestos-containing product by name. Specifically, Honeywell received, reviewed, and commented on Trust claims processing worksheets that described in clear terms the manner in which the Trust evaluates such claims.

112.    Indeed, the Trust has regularly processed, approved, and paid such claims since these worksheets were first implemented in 2016. Honeywell not only received those initial worksheets, but received revisions to those worksheets and commented on those revisions in real time. That Honeywell did not vociferously object to those worksheets is unsurprising because Honeywell itself has acknowledged that when exposure evidence supporting a claim that does not identify a specific NARCO asbestos-containing product by name nevertheless "set[s] forth particular facts relating to their exposures and activities," then "an inference can be fairly drawn that they were likely regularly exposed to 'NARCO asbestos-containing products.'" (Letter from S. Glickman to Trustees at 2, Oct. 14, 2015.)

113.    Moreover, the Trust implemented a process by which both the Trustees and Honeywell can monitor in real-time every claim that does not identify a specific NARCO asbestos-containing product by name, but, based on particular facts alleged in support of that claim, the Trust's claims processor has determined that there was sufficient evidence to support a claim-specific inference of exposure to a NARCO asbestos-containing product. That process involved the programming of a specific reference code identified in the eClaims system. Honeywell was not only aware that the Trust implemented such a tracking process, but specifically (a) requested that the Trust program a new type of report that would enable Honeywell to identify such claims on a rolling basis through the One-Way Mirror, and (b) inquired about the use of that code in

specific claims processing scenarios.  As a result, Honeywell's claim that the Trust secretly resurrected the "refractory inference" is unsupported by the facts and Honeywell's claim that it only learned of the practice it now attacks in July 2020 is demonstrably false.

114.    More stunningly still, Honeywell's anticipated complaint also accuses the Trust of improperly renewing certain policies designed to alleviate hardships that the COVID-19 pandemic has imposed on Trust claimants, many of whom are older adults with severe respiratory and other illnesses.  Honeywell previously objected, for example, to the Trust temporarily (i) allowing claimants to e-sign documents using industry standard software,  (ii) suspending the requirement that claimants notarize certain documents, (iii) suspending the requirement that documents be witnessed by more than one person or by a person unrelated to the signatory, and (iv) extending statute of limitations deadlines and the deferral period pursuant to TDP Section 5.3 for two months. (Letter from J. Calandra to S. Esserman, Dec. 21, 2020.)

115.    Honeywell now implies only that it objected to the Trust's purported "extension of the statute of limitations" after the COVID pandemic began in March 2020.   (Honeywell Complaint ¶ 193.)  Honeywell's allegation is not only belied by the record on this issue—which demonstrates that it *consented* to all of the Trust's COVID-related policies and to the Trustees exercising their discretion to renew those policies throughout the COVID pandemic—but also evidences complete disregard for claimants' health.  Honeywell has nevertheless argued that it has the "absolute" right to "withhold its consent" to any COVID-related policy that purportedly amends the TDP and "will increase Honeywell's funding obligations to the Trust[.]"  (Honeywell Complaint ¶ 195.)

116.    The Trustees will not be intimidated into forcing claimants to choose between their safety and the Trust's claims process, particularly when Honeywell has no right to object to those

policies to begin with. While Honeywell accuses the Trust of acting in "bad faith" by implementing and extending certain COVID-related claims filing policies, that Honeywell nevertheless waited over a year to seek relief in connection with those COVID-related policies speaks volumes about Honeywell's intent with initiating litigation against the Trust.

**IX.   Honeywell's Repeated And Consistent Abuse Of Its Rights And Benefits Under The Trust Documents And The Plan.**

**A. *Honeywell's Attempts To Abuse The Consultation Process, Obstruct The Claims Process, And Deny The Trust Access To Relevant Information.***

117.    Honeywell's repeated litigation threats and attempts to cram down a buy-out of its funding obligations are only two of the methods of coercion and intimidation that Honeywell has deployed against the Trust. Since the Trust's Effective Date, Honeywell has consistently attempted to obstruct and undermine claims processing and the Trust's administration.

118.    When Honeywell is not actively pursuing litigation (or litigation threats) against the Trust, it uses its team of attorneys and reviewers to scrutinize thousands of Trust claims through the One-Way Mirror, advance redundant inaccurate complaints to which the Trust must respond, create a record upon which it can base new litigation at any time, and try to cut side deals to pay claims that it alleges are invalid. In particular, Honeywell's shadow claims processors employed by McDermott Will & Emery LLP have frequently reviewed hundreds of claims per day and extracted curated samples, which Honeywell's litigation team has then used to threaten the Trust and build a litigation record. In 2018, for example, Honeywell's parallel processors reviewed ***over eleven thousand claims***, apparently using what they learned to draft and send threatening letters to the Trust and develop a supposed basis for litigation. In the past, Honeywell has even admitted that its shadow claims processors audit essentially every set of claims that receives offers. Based on Honeywell's correspondence, its shadow claims processors have even continued to audit claims that have not yet received offers.

119.    In addition to monitoring the Trust through the One-Way Mirror, Honeywell also has supporting documentation and a related database for hundreds of thousands of NARCO asbestos claims that Honeywell settled after NARCO filed for bankruptcy but before the Plan was confirmed. The Trust does not have access to these documents. The Trust has repeatedly requested access in order to ensure its claims processing policies and determinations are informed by the full NARCO-related settlement history. Honeywell has refused.

120.    Honeywell also uses a database of asbestos claims filed in the tort system against Bendix, an entity owned by Honeywell, to find information allegedly bearing upon claims filed with the Trust. This database provides Honeywell with information about Bendix litigants with asbestos claims who may also be claimants of the Trust. On information and belief, Honeywell uses the Bendix database to acquire, compile, and cross-reference information that Trust claimants have submitted in the tort system against information that those claimants have submitted to the Trust. Honeywell then uses selective and frequently incomplete information from that database to challenge those claims in particular and the Trust's policies more broadly.

121.    The curated information that Honeywell shares with the Trust cannot be examined in isolation. For example, as noted above, NARCO defense counsel were directed to avoid questions about NARCO asbestos-containing products unless the deponent mentioned NARCO first or the deposing lawyer was sure that the witness would deny knowing about NARCO products. On information and belief, that directive was made in bad faith so that NARCO could preserve and advance the argument that such claimants were never exposed to NARCO asbestos-containing products and submitted conflicting and fraudulent sworn statements. Honeywell has repeatedly advanced this very argument in an attempt to block claims on a massive basis.

122.    The Trust has repeatedly requested access to the Bendix database and other databases used by Honeywell to gain information helpful in evaluating claims filed with the Trust. Each time, Honeywell has declined, deflected, or simply refused to answer.  In some instances, rather than make constructive recommendations, Honeywell has provided carefully selected and redacted information from its databases to challenge claims in the Trust's queues, but refused to provide additional relevant information requested by the Trust on the ground that the material is attorney work product (*i.e.*, prepared in connection with anticipated litigation).  As a result of Honeywell's one-sided cherry-picking from its databases and its partial disclosures to the Trust, the Trustees have frequently been unable to test the validity of Honeywell's self-serving attacks on claimants and their counsel.

**B.   *Honeywell Enjoys The Benefits Of The Plan While Attempting To Circumvent It.***

123.    Honeywell has also violated the Plan and the Channeling Injunction by (a) attempting to obstruct the Trust's processing and payment (where appropriate) of claims supported by the same types of exposure evidence that NARCO and Honeywell accepted to settle claims prior to the Trust's Effective Date, and (b) negotiating discounted side deals with claimants' law firms outside the procedures set forth in the Plan, the Trust Agreement, and the TDP.

124.    The Court carefully weighed the requirements of Section 524(g) before approving the Plan and its Channeling Injunction for the benefit of non-debtor Honeywell.  Among other requirements, the Court was required to determine that extending the benefits of a channeling injunction to Honeywell would be "fair and equitable with respect to the persons that might subsequently assert . . . demands [against the Trust], in light of the benefits provided, or to be provided, to such trust on behalf of . . . such third party."  (11 U.S.C. § 524(g)(4)(B)(ii).)

125.    The Court determined that approving a channeling injunction in favor of Honeywell was "fair and equitable" because the Channeling Injunction was granted "***in exchange for the***

*contributions of Honeywell*," which would confer a "substantial" benefit on the Trust. (Confirmation Order, Ex. 1 ¶ 331(b)-(c) (emphasis added).)

126.    As required by Section 524(g)(4)(B)(ii), the Court also determined that approving a channeling injunction for the benefit of Honeywell was "fair and equitable" with respect to future claimants because (a) the injunction would "provide a definite path to recovery for those claimants with legitimate NARCO Asbestos Trust claims . . . without the intervening burdens of prosecution and proof in the tort system," and (b) "*all claimants – pre-petition, post-petition, current and future – will be treated substantially in the same manner* by the NARCO Asbestos Trust, by virtue of Honeywell's commitment, . . . [and] almost certainly will recover 100% of the TDP prescribed liquidated values of their claims *in significantly less time* than would be the case in the tort system." (Confirmation Order, Ex. 1 ¶ 331(d)-(e) (emphasis added).)

127.    Section 524(g) also required that, as a prerequisite to approving the Plan, the Court make certain general determinations concerning the operation and equity of channeling claims to the Trust. Section 524(g)(2)(B)(ii)(V) requires that the Trust be operated "through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." (11 U.S.C. § 524(g)(2)(B)(ii)(V).)

128.    The Court found that the Plan satisfied Section 524(g)(2)(B)(ii)(V) because (a) the "TDP provides a comprehensive set of procedures for valuing and paying current claims and future demands," (b) *the TDP provides "procedures for valuing and paying current claims in the substantially same manner as future demands,"* and (c) "[*b*]*y virtue of Honeywell's commitment*

*to an evergreen funding obligation, the NARCO Asbestos Trust will be in a position to pay*

*claims at the values at which they are liquidated.*"  (Confirmation Order, Ex. 1 ¶ 328.)  And, as

separately required by Section 524(g)(2)(B)(ii)(III), the Court determined that permitting the

prosecution of NARCO Asbestos Trust Claims "to continue outside of the procedures proposed in

the NARCO Plan . . . would threaten the equitable treatment of such claims and demands."

(Confirmation Order, Ex. 1 ¶ 325(d).)

129.    According to the Plan, the Trustees are required to "act as fiduciaries to the NARCO

Asbestos Trust" and "administer the NARCO Asbestos Trust in accordance with the NARCO

Asbestos Trust Agreement and the NARCO Asbestos TDP."  (Confirmation Order, Ex. 1 ¶ 158.)

The Confirmation Order and the Plan do not provide a means by which other parties may resolve

claims outside of the Trust and, in fact, require all claims to be resolved in accordance with the

Trust Agreement and TDP.  (*See, e.g.*, Confirmation Order, Ex. 1 ¶ 161 ("All NARCO Asbestos

Trust Claims **will be resolved** pursuant [to] the terms, provisions and procedures set forth in the

NARCO Asbestos Trust Agreement and the NARCO Asbestos TDP.") (emphasis added); Plan

§ 3.2.4.1 ("All NARCO Asbestos Trust Claims **will be resolved** pursuant to the terms, provisions

and procedures set forth in the NARCO Asbestos Trust Agreement and the NARCO Asbestos

TDP.") (emphasis added).)

130.    The deal struck in the Plan and approved in the Court's Confirmation Order is

crystal clear:  Honeywell obtained the extraordinary benefit of the Section 524(g) Channeling

Injunction by agreeing to fund in perpetuity a Trust that would treat "all claimants – pre-petition,

post-petition, current and future – . . . substantially in the same manner. . . ."  (Confirmation Order,

Ex. 1 ¶¶ 331(d)-(e).)  In other words, the Trust is required to treat Trust claimants "substantially

in the same manner" as Honeywell and the tort system had before the Plan was approved.

131.    Honeywell, in violation of that requirement, is now advancing interpretations of the TDP that are contrary to the outcomes that it negotiated prior to the Effective Date.  In fact, Honeywell is simultaneously attempting to amend the Trust's governing documents to draft its own interpretations into those governing documents.

132.    Honeywell settled hundreds of thousands of claims prior to the Effective Date to secure claimants' votes in favor of the Plan.  The settlement agreements by which Honeywell secured those votes often called for Honeywell to pay high settlement values based on much less claim-related information than Honeywell now insists the Trust require from claimants. Additionally, several of those settlement agreements required that claimants satisfy evidentiary standards that were nearly identical to those set forth in the TDP.  On information and belief, Honeywell accepted under those settlement agreements affidavits that included form-language allegations of exposure to NARCO asbestos-containing products—the exact type of exposure evidence Honeywell now derides as neither competent nor credible.

133.    The Trust has repeatedly requested access to documentation submitted by claimants in connection with the post-petition settlement agreements that Honeywell entered into during NARCO's bankruptcy proceedings.  The Trust has requested access to that documentation to ensure that the Trust is processing current Trust claims consistent with NARCO's and Honeywell's settlement history.  Honeywell previously made this documentation available to objectors during the NARCO Chapter 11 proceedings to obtain approval of the Channeling Injunction.  Tellingly, Honeywell has continually refused the Trust access to this documentation.

134.    At the same time, Honeywell has repeatedly abused its audit and consultation rights under the TDP to pressure cohorts of claimants into settling outside of the Trust's Court-mandated processes.  On information and belief, Honeywell has tasked its shadow claims processing team

with reviewing and challenging an immense number of Trust claims for the purpose of suppressing

the number of claims that the Trust pays and settling those very same claims for lesser value in

side-deal settlements.

135.    Honeywell's claim suppression tactics were initially so successful that it deemed it

necessary to disclose them to the Securities and Exchange Commission, writing:

> We are also aware, anecdotally, that the inherent uncertainties arising from the
> disputes and Honeywell's vigilance have had an impact on the plaintiffs' bar's
> claims filing approach.  Several significant plaintiff's firms have said that their
> approach to filing claims with the NARCO Trust is different than with other trusts
> and that some are waiting to file, to the extent possible until these issues are
> resolved, and it is possible that many of these claims may never be submitted.

(Letter from J. Tus to A. Mew and P. Kuhn, Aug. 20, 2018.)  While the Trust takes no position on

the propriety of claimants' firms choosing to settle with Honeywell under these circumstances, it

is unsurprising that some such firms would agree to circumvent the Trust's procedures in light of

Honeywell's tactics.  Honeywell has for years attempted to slow the Trust's rate of claim payments

and specifically targeted law firms with high claims filing rates, risking that those law firms' sick

clients would not be timely paid, if they were paid at all.

136.    During its prior litigation against the Trust, for example, Honeywell presented

public and highly critical testimony from one of its outside lawyers concerning the form of

exposure evidence that a certain law firm ("**Claimant Firm B**") submits to the Trust on behalf of

its clients.  In fact, Honeywell insisted that the Trust refrain from paying dozens of claims filed by

Claimant Firm B supported by such evidence to avoid an emergency hearing before this Court.  In

addition, Honeywell subpoenaed Claimant Firm B for dozens of broad categories of documents.

After dismissing its litigation against the Trust, Honeywell continued its attacks on Claimant Firm

B, including by demanding that the Trust extensively audit Claimant Firm B and refrain from

paying its claims until that audit concluded.  Then, as the Trust's independent audit was ongoing,

Honeywell negotiated a global settlement with Claimant Firm B that resulted in Claimant Firm B withdrawing substantially all of its claims with the Trust in exchange for settlement values below those set forth in the TDP.

137.    On information and belief, Claimant Firm B is not the only claimant law firm that Honeywell has targeted through these pressure tactics calculated to extract side-deal settlements for values at a discount compared to TDP liquidated values.    On information and belief, Honeywell's side-deal settlements (and contemplated or attempted side-deal settlements) are "outside of the procedures proposed in the NARCO Plan," treat claimants inequitably, and violate Section 524(g).

138.    On information and belief, Honeywell has repeatedly threatened to file (and has now filed) this litigation against the Trust, and has attempted to impede the Trust's processing and payment of valid claims, so that it may ***pay less*** for those claims in these side-deal settlements and its proposed global buy-out of its evergreen funding obligations.    Honeywell's litigation threats and persistence in stalling claims processing have, on information and belief, caused claimants to become more willing to settle with Honeywell directly (and at a discount).    Honeywell's intransigence thus could have the malign effects of denying the Trust's beneficiaries full compensation pursuant to the TDP and undermining the Channeling Injunction.

**C.    *Honeywell's Actual Funding To The Trust For The Payment Of Claims Is Far Less Than Projected.***

139.    Honeywell's endgame is clear: it obstructs and intimidates the Trust not due to legitimate disputes about the Trust's claims processing and operations, but to improve its bottom line by minimizing the number and value of Trust claims it pays from its own pocket.

140.    During NARCO's bankruptcy, in order to secure the protection of a channeling injunction as a non-debtor, Honeywell presented to this Court claim projections that it would pay

billions of dollars in NARCO asbestos liability. Dr. Francine Rabinovitz, Honeywell's valuation expert, opined that Honeywell should expect to fund up to $2.3 billion in order to pay in full up to 297,000 valid future claims channeled to the Trust.

141. The Bankruptcy Court relied on Dr. Rabinovitz's expert report and financial projections in confirming the Plan and issuing a 524(g) channeling injunction for the benefit of Honeywell. The Bankruptcy Court found that Honeywell's evergreen financial contribution would ensure the "NARCO Asbestos Trust will be in a financial position to pay every eligible claimant the Average Values in the NARCO Asbestos TDP under Individual Review and the Scheduled Values for Disease Levels I and II under Expedited Review." (Confirmation Order ¶¶ 163-65.)

142. The Trust Agreement reflects this immense future liability that Honeywell channeled to the Trust. Section 2.3(c) of the Trust Agreement provides that Honeywell is obligated to provide annual funding of up to $150 million, depending on the year, indefinitely for ACC claims (*i.e.*, the claims that Honeywell did not settle prior to or during the NARCO bankruptcy when trying to convince parties to vote in favor of the Plan). But, until the second half of 2019, nearly all ACC claims were paid from dividends on the stock in HWI that the Trust received in the restructuring. And because HWI recently paid an additional $47.4 million dividend to the Trust, it is unlikely that Honeywell will provide additional funding for ACC claims until early 2022.

143. Honeywell's ACC funding obligation is apart from and in addition to funding the hundreds of thousands of NARCO asbestos claims which Honeywell settled to gain approval of the Plan and its channeling injunction protection. Honeywell nevertheless conflates these two categories of claims, and asserts that it has already paid billions of dollars to resolve NARCO-related asbestos claims in fulfillment of its obligation to pay valid claims submitted to the Trust.

144.   ***In fact, now thirteen years after the Plan was approved, Honeywell has paid only a small fraction of its total projected claims liability towards ACC claims***.  Honeywell, a solvent non-debtor, received over a decade of Section 524(g) protection without paying a dime to the claims found valid by the Trust:

| Year: | Honeywell's Maximum Obligation to Contribute to the ACC Fund: | Honeywell's Actual Contributions to the ACC Fund: |
|---|---|---|
| 2013 | $150 million | $0 |
| 2014 | $140 million | $0 |
| 2015 | $140 million | $0 |
| 2016 | $140 million | $0 |
| 2017 | $140 million | $0 |
| 2018 | $140 million | $0 |
| 2019 | $145 million | $28.9 million |
| 2020 | $145 million | $78.1 million |
| 2021 | $145 million | $88.1 million |
| **Total:** | **$1.285 billion** | $195.1 million |

145.   That began to change in the second half of 2019, when Honeywell, for the first time, contributed $28,919,400 in funding to the ACC Fund.  That Honeywell's latest litigation is following shortly thereafter is far from coincidental.  For Honeywell, the cost of launching a multi-million dollar litigation against the Trust pales in comparison to the potential cost of contributing to the ACC Fund in perpetuity.

**D.** ***Honeywell's Claim That The Trustees Are Mismanaging Trust Assets and Engaging In Wasteful Spending Is Made In Bad Faith.***

146.    Honeywell's claim in its contemporaneously filed complaint that the Trustees are "mismanaging Trust assets" and "engaging in wasteful spending" is, like its earlier threats to seek their removal, an obvious attempt to harass, threaten, and intimidate the people who run the Trust. Honeywell alleges that the Trustees have permitted a conflict of interest (or, if not a conflict, the "appearance of impropriety") and mismanaged costs. Each of those assertions is false and provides no support for Honeywell's claim. Honeywell's outrage over the supposed conflict of interest is manufactured and the Trust's costs are the direct result of Honeywell's tactics—which, as described throughout, have often involved actual and threatened litigation—as well as the unusual complexity of the TDP that Honeywell negotiated.

147.    Honeywell posits that the Trust's engagement of a consulting firm affiliated with one of the Trustees "creates an obvious conflict of interest and, at a minimum, the appearance of impropriety[.]" (Honeywell's Complaint, ¶ 204.) This allegation is meritless and attempts to rewrite history. In June 2016, ***with full disclosure to Honeywell*** and the other Constituents, the two Trustees who are not affiliated with that consulting firm decided to retain the firm as a management consultant to the Trust, with two of the firm's employees initially designated to provide services as required.

148.    The Trust engaged that consulting firm pursuant to authority under the Trust Agreement, which provides that:

i.    "[T]he Trustees shall have the power to . . . engage such . . . consultants . . . as the business of the NARCO Asbestos Trust requires[.]" (Trust Agreement § 3.1(c)(x).)

ii.     The Trustees may employ and consult with experts "***regardless of whether any such***

***[expert] is affiliated with any of the Trustees in any manner***."  (Trust Agreement §

5.8 (emphasis added).)

iii.    "The Trustees may . . . select any Trustee to serve as an officer or manager of the

Trust or as a consultant to the Trust."  (Trust Agreement § 5.10.)

149.    Although the Trust Agreement fully authorizes the Trust to employ experts

affiliated with a Trustee, to eliminate any conceivable doubt over the engagement, the Trustee

affiliated with the consulting firm did not vote on the decision to retain the firm and recuses himself

from all decisions approving that firm's fees, invoices, and assignments.

150.    The Trustees have considered hiring an executive director and other permanent

employees on several occasions.  Each time, following investigation and reflection, the Trustees

decided that the Trust's continued relationship with the consulting firm is more practical and cost

effective than comparable alternatives.

151.    As for the Trust's operational budget, as this Court has acknowledged, Honeywell

is a significant driver of the Trust's costs, including the Trust's need for special counsel.  When

Honeywell is not threatening the Trust or its Trustees, making oppressive audit requests, or

attempting to fundamentally alter its relationship with the Trust, the Trust's operating expenses

are very low and its need for special counsel is limited.  The discussions over the Trust's 2021

budget highlight this reality: For the fourth consecutive year, Honeywell asked the Trust to budget

assuming no litigation or significant disputes but now, Honeywell is not only suing the Trust, but

has simultaneously proposed ending its evergreen funding obligations and amending all of the

Trust's governing documents.  Honeywell's direct litigation threats, and now its proposed buy-

out, cause the Trust to undertake expensive and unexpected work in response.  As this Court

explained in January 2016, "Honeywell can't limit the trust and come on like gangbusters with all the forces of whatever and then expect the trust not to have the resources to defend the issues[.]" (Jan. 28, 2016 Hr'g Tr. 11:14-19.)

152.    Through its complaint, Honeywell seeks the very rights it gave up in exchange for the 524(g) Channeling Injunction, including the right to decide which NARCO claims are paid. Through its proposed buy-out, Honeywell seeks to hold onto the benefits of that 524(g) Channeling Injunction in perpetuity without honoring its perpetual obligations to the Trust.  In response, the Trust must bring this Complaint to obtain declarations of its rights under the Trust Documents and enjoin Honeywell's actions that are in contravention of the Plan and the Trust Documents.

## COUNT 1
**(Honeywell's Breach of the Trust Agreement and the TDP – Obstruction of the Trustees' Administration of the Trust)**

153.    The Trust repeats and reasserts each and every allegation contained in paragraphs 1 through 152 as though they were fully set forth herein.

154.    Section 2.2 of the Trust Agreement states that "[t]he purpose of the NARCO Asbestos Trust is to . . . use the NARCO Asbestos Trust Assets and income to promptly pay holders of valid NARCO Asbestos Trust Claims in such a way that holders of similar NARCO Asbestos Trust Claims are paid in substantially the same manner[.]"  (Trust Agreement § 2.2.)

155.    Section 3.1(a) of the Trust Agreement states that "the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the NARCO Asbestos Trust, including, without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware or such other state as may be the Trust's state of domicile."  (Trust Agreement § 3.1(a).)

156.    Section 3.1(c)(x) of the Trust Agreement states that "the Trustees shall have the power to . . . engage such . . . consultants . . . as the business of the NARCO Asbestos Trust requires[.]"  (Trust Agreement § 3.1(c)(x).)

157.    Section 3.2(d) of the Trust Agreement requires that the Trustees obtain the consent of the Constituents only for certain specific actions, and that such consents may not be unreasonably withheld.  (Trust Agreement § 3.2(d).)

158.    Section 5.8 of the Trust Agreement states that the Trustees may employ and consult with experts "regardless of whether any such [expert] is affiliated with any of the Trustees in any manner."  (Trust Agreement § 5.8.)

159.    Section 5.10 of the Trust Agreement states that the "Trustees may . . . select any Trustee to serve as an officer or manager of the Trust or as a consultant to the Trust."  (Trust Agreement § 5.10.).

160.    Section 4.3(a)(1) of the TDP states that the "Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all claims that can easily be verified by the NARCO Asbestos Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level," and that "Expedited Review thus provides claimants with a substantially less burdensome process for pursuing NARCO Asbestos Trust Claims than does the Individual Review Process. . . ."  (TDP § 4.3(a)(1).)

161.    Sections 4.3(a)(2), 4.3(b)(2), and 2.2 of the TDP further provide that "*the NARCO Asbestos Trust*" "shall . . . determine whether" Expedited Review claims are compensable and in what amount (TDP § 4.3(a)(2)), "shall liquidate the value of each Individual Review claim" (TDP § 4.3(b)(2)), and "may determine that the liquidated value of a claim that undergoes the Individual Review Process is less than or greater than its Scheduled Value" (TDP § 2.2).

162.    By its actions, Honeywell has breached Sections 3.1, 3.2, 5.8, and 5.10 of the Trust Agreement and Sections 2.2 and 4.3 of the TDP.

163.    The Trust seeks an order from the Court finding that Honeywell has breached the Trust Documents.

164.    The Trust also seeks an order enjoining Honeywell from further interference with the Trustees' substantial discretion under the Trust Documents, or with the claims process itself, in violation of these provisions.  Unless Honeywell is enjoined, it will persist in harassing and threatening the Trust and interfering with the Trust's operations and payment of valid claims.

165.    The Trust has suffered and will continue to suffer irreparable harm as a result of Honeywell's violation of the Trust Documents and its pattern of attempted obstruction, including by withholding its consent unreasonably and attempting to convert its consultation rights into consent rights.

166.    Honeywell will suffer no harm by being forced to comply with the express terms of the Trust Documents and, in fact, will merely be compelled to abide by its prior commitments to the Trust and this Court.

## <u>COUNT 2</u>
### (Honeywell's Breach of the Covenant of Good Faith and Fair Dealing)

167.    The Trust repeats and reasserts each and every allegation contained in paragraphs 1 through 166 as though they were fully set forth herein.

168.    Implied in every contract is a covenant that the parties will act fairly and in good faith.

169.    By its actions, including its refusal to share documents and information to which the Trust is entitled and its repeated and continuing attempts to obstruct the Trust's payment of

valid claims, Honeywell has repeatedly failed, and continues to fail, to deal with the Trust in good faith.

170.    By reason of the foregoing, Honeywell has breached the Trust Agreement's express requirement that it deal with the Trust in "good faith" and pursuant to the implied covenant of good faith and fair dealing.

171.    The Trust seeks an order from this Court finding that, by its conduct, Honeywell has violated the covenant of good faith and fair dealing implied in the Trust Agreement.

**COUNT 3**
**(Honeywell's Violations of 11 U.S.C. § 524(g))**

172.    The Trust repeats and reasserts each and every allegation contained in paragraphs 1 through 171 as though they were fully set forth herein.

173.    By its actions, Honeywell has violated and continues to violate Section 524(g) of the Bankruptcy Code.

174.    The Trust asks this Court for an order and judgment finding that Honeywell has violated Section 524(g) by, among the other wrongs alleged throughout this Complaint, (1) refusing to cooperate with the Trust and interfering with the Trust's operations, (2) demanding that the Trust reject exposure evidence previously accepted by NARCO and/or Honeywell in their tort system settlements, (3) impairing the ability of claimants to secure prompt payment of their valid claims as provided in the Trust Documents, and (4) attempting to induce claimants and their counsel to settle valid claims outside the procedures established by, and below the Scheduled Values set forth in, the Plan and the Trust Documents.

175.    Unless Honeywell is enjoined from further violations of Section 524(g), it will persist in harassing the Trust and interfering with the Trust's ability to pay valid claims of people injured by NARCO asbestos-containing products.

176.    The Trust has suffered and will continue to suffer irreparable harm as a result of Honeywell's violations.

177.    Honeywell will suffer no harm by being forced to comply with the express terms of Section 524(g) and, in fact, will merely be compelled to abide by the law and its prior contractual commitments.

178.    Honeywell's continued violation of Section 524(g) undermines public confidence in the system of asbestos trusts, as well as confidence in the legal system generally.

179.    The Trust therefore requests that the Court enjoin Honeywell from violating Section 524(g), including through the illegal conduct and pattern of attempted obstruction described above, and order such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Trust prays that this Court enter judgment in its favor and against Honeywell and grant the following relief:

A.   A permanent injunction prohibiting Honeywell from:

    i.    further violating Sections 3.1, 3.2, 5.8, and 5.10 of the Trust Agreement,

    ii.    further violating other provisions of the Trust Agreement and 11 U.S.C. § 524(g), including through breaches of the implied covenant of good faith and fair dealing, and

    iii.    further violating the Channeling Injunction by attempting to resolve and pay claims outside the Plan, the Trust Agreement and the TDP.

B.   Declaratory judgment that:

    i.    Honeywell has breached the provisions of the Trust Agreement and the TDP,

ii.    Honeywell has breached the covenant of good faith and fair dealing implied in the Trust Agreement and the TDP,

iii.    Honeywell has violated the provisions of 11 U.S.C. § 524(g) and the Channeling Injunction, and

iv.    The Trustees have no liability for, and are exonerated and held harmless, for any acts by Honeywell to resolve claims outside the Plan, the Trust Agreement and the TDP, and have no liability for any disparate treatment of similarly situated claimants resulting from acts taken by Honeywell outside the Plan, the Trust Agreement and the TDP, and

C.  Such other relief as the Court deems just and proper.

Dated: September 20, 2021
       Pittsburgh, Pennsylvania

<div style="margin-left:40%">

BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.

*/s/ David W. Ross*
David W. Ross, Esquire
PA ID No. 62202
dross@babstcalland.com
Erica Koehl Dausch, Esquire
PA ID No. 306829
edausch@babstcalland.com
Two Gateway Center, 7th Floor
Pittsburgh, PA 15222
Telephone: (412) 394-5400
Fax: (412) 394-6576

- and -

WILLKIE FARR & GALLAGHER LLP

Joseph T. Baio (*pro hac vice* forthcoming)
Rachel C. Strickland (*pro hac vice* forthcoming)
Daniel I. Forman (*pro hac vice* forthcoming)
Stuart R. Lombardi (*pro hac vice* forthcoming)
Philip F. DiSanto (*pro hac vice* forthcoming)
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8000
Fax: (212) 728-8111

*Attorneys for North American Refractories Company
Asbestos Personal Injury Settlement Trust*

</div>